UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————
                                          :
In re                                     :        Chapter 11
                                          :
JESUP & LAMONT, INC. and                  :
JESUP & LAMONT SECURITIES                 :
CORPORTION,                               :        Case No. 10-14133 (ALG)
                                          :        (Jointly Administered)
                    Debtors.              :
———————————————————————————:
                                          :
MATTHEW C. HARRISON, JR.,                 :
CONFIRMATION TRUSTEE                      :
OF THE JESUP LIQUIDATING TRUST,           :
                                          :
                    Plaintiffs,           :
                                          :
        v.                                :        Adv. Pro. No. 12-1168
                                          :
NEW JERSEY COMMUNITY BANK,                :
ROBERT O'DONNELL, and                     :
STEPHEN RABINOVICI,                       :
                                          :
                    Defendants.           :
———————————————————————————:


MEMORANDUM DECISION



A P P E A R A N C E S :

WILK AUSLANDER LLP
*Counsel to Post-Confirmation Trustee*
1515 Broadway, 43rd Floor
New York, New York 10036

        By:    Stuart M. Riback, Esq.
               Eric J. Snyder, Esq.
               Jessica Taran, Esq.

KLESTADT & WINTERS LLP
*Counsel to New Jersey Community Bank*
*and Robert O'Donnell*
570 Seventh Avenue, 17th Floor
New York, New York 10018

　　　By:　　Tracy L. Klestadt, Esq.
　　　　　　Brendan M. Scott, Esq.


LOWENSTEIN SANDLER LLP
*Counsel to Steven Rabinovici*
1251 Avenue of the Americas
New York, New York 10020

　　　By:　　Robert C. Bonebert, Esq.
　　　　　　David M. Banker, Esq.
　　　　　　Richard C. Wolter, Esq.


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**


## Introduction

　　　Debtor Jesup & Lamont, Inc. ("JLI") filed a voluntary chapter 11 bankruptcy petition on

July 30, 2010.  About seven weeks later, on September 24, 2010, its wholly owned broker-dealer

subsidiary, Jesup & Lamont Securities Corp. ("JLSC"), also filed under chapter 11.  The two

cases were jointly administered and the Court approved a Chapter 11 Plan of Liquidation (the

"Plan") on October 6, 2011.  By virtue of provisions in the Plan, Matthew Harrison was

appointed "Confirmation Trustee" of the "Jesup Liquidating Trust" (the "Trust"), authorized to

pursue claims on behalf of either or both estates.

　　　On March 14, 2012, the Confirmation Trustee (the "Trustee") filed, and later amended,

an adversary complaint in this Court (as amended, the "Complaint").  The Complaint was filed in

the name of the Trust and on behalf of both estates against New Jersey Community Bank

("NJCB"), Robert O'Donnell, chief executive officer and chairman of the board of NJCB, and

Stephen Rabinovici, former chairman of the board of both Debtors.  Count I alleges breach of

fiduciary duty claims against Rabinovici; Count II alleges aiding and abetting breach of fiduciary

duty claims against NJCB and O'Donnell; Counts III and IV allege fraudulent conveyance

claims under the Bankruptcy Code and New York State law, respectively, against NJCB; and

Count V alleges, in the alternative, preferential transfer claims under 11 U.S.C. § 547 against

NJCB.  On July 17, 2013, defendants NJCB and O'Donnell filed a motion to dismiss the

preference and aiding and abetting breach of fiduciary duty claims asserted against them.  That

same date, defendant Rabinovici filed a motion to dismiss the count asserted against him alleging

breach of fiduciary duty if the underlying causes of action, fraudulent conveyance and

preference, were dismissed.  On July 26, 2013, the Trustee responded with a motion for

summary judgment in his behalf on the preference and fraudulent conveyance claims against

NJCB.

### Facts

JLI was a holding company whose principal subsidiary was JLSC, a registered broker-

dealer subject to regulation, *inter alia*, by the Financial Industry Regulatory Authority

("FINRA").  On May 28, 2009, JLI borrowed $2.1 million from NJCB (the "JLI Loan").

Plaintiff's Statement of Undisputed Material Facts ("Pl's Stmt.") at ¶ 10; Counter Statement of

Undisputed Facts of Defendants NJCB and Robert O'Donnell ("Counter Stmt.") at ¶ 10.  JLI

transferred the $2.1 million to its wholly-owned subsidiary, JLSC, and it is not disputed that the

funds became the property of JLSC.  However, the money remained at NJCB.  Counter Stmt. at

¶ 11.[1]  JLSC agreed to keep the $2.1 million in a certificate of deposit account at NJCB (the

---

[1] The purpose of the transaction is not entirely clear from the record, but it is assumed that it was engaged in for regulatory purposes.

"NJCB CD Account") and executed an "Assignment of Deposit Account" by which it pledged the funds as collateral for the JLI Loan. *Id*. There is no dispute that JLSC did not guarantee the JLI Loan, but it is equally without dispute that NJCB had a claim against the property of JLSC up to the amount of the collateral deposited.

On July 23, 2009, FINRA demanded that some or all of the $2.1 million be moved to another bank for reasons that are not clear on the record. JLI requested a modification of the JLI Loan terms to permit the $2.1 million in the NJCB CD Account to be moved. Pl.'s Stmt. at ¶¶ 13, 14, 17; Counter Stmt. at ¶¶ 13, 14, 17. Roma Bank agreed to accept the funds in an account in the name of JLSC at Roma Bank (the "Roma Account"). To continue to protect NJCB's loan, Roma issued a $2 million letter of credit in favor of NJCB (the "Roma L/C"), collateralized by $2 million deposited by JLSC. Pl.'s Stmt. at ¶ 19; Counter Stmt. at ¶ 19. NJCB approved the transfer of funds and accepted delivery of the Roma L/C. Pl.'s Stmt. at ¶ 18; Counter Stmt. at ¶ 19. $100,000 remained in the NJCB CD Account and continued to collateralize the loan. Pl.'s Stmt. at ¶ 21; Counter Stmt. at ¶ 21. The Assignment of Deposit Account agreement remained outstanding. It continued to provide that collateral would include "all additional deposits hereafter made to the Account." (Dkt. No. 38, Ex. F-3).

The material facts apparently did not change for the next ten months. The initial loan term was due to expire on May 28, 2010. Pl.'s Stmt. at ¶ 26; Counter Stmt. at ¶ 26. In April 2010, JLI requested that the loan term be extended for another year. Pl.'s Stmt. at ¶ 27; Counter Stmt. at ¶ 27. NJCB internally approved renewal of the loan for another year in June 2010, although new loan documents were never executed. Pl.'s Stmt. at ¶¶ 28-29; Counter Stmt. at ¶¶ 28-29. At about the same time, however, FINRA apparently became concerned about the safety of the $2 million deposited by JLSC, as the Roma account was not FDIC-insured.

4

In June 2010, FINRA demanded that the $2 million be deposited in an FDIC-insured account. Pl.'s Stmt. at ¶ 34; Counter Stmt. at ¶ 34. On June 24, Steven Rabinovici, the chairman of the board of both Debtors, requested that Roma Bank close the Roma Account and transfer the funds to an account at Hopewell Valley Community Bank ("Hopewell Valley"), where the account would be insured. Pl.'s Stmt. at ¶ 37; Counter Stmt. at ¶ 37. Roma Bank wired the money as requested, without imposing any written conditions on the transfer. Pl.'s Stmt. at ¶¶ 38, 40; Counter Stmt. at ¶¶ 38, 40. Although it was apparently contemplated that Hopewell Valley would open a letter of credit in favor of NJCB, as Roma Bank had, Hopewell Valley was unable to do so immediately. Pl.'s Stmt. at ¶¶ 42, 44; Counter Stmt. at ¶¶ 42, 44. On June 25, as the financial situation at both Debtors was deteriorating rapidly, Rabinovici sent a letter to Hopewell Valley requesting that Hopewell Valley wire the $2 million to the NJCB CD Account. Pl.'s Stmt. at ¶ 47; Counter Stmt. at ¶ 47. Hopewell Valley wired the money to NJCB the same day, and it was deposited into the NJCB CD Account (the "NJCB Transfer"). Pl.'s Stmt. at ¶ 48; Counter Stmt. at ¶ 48. Three days later, on June 28, at Rabinovici's direction, NJCB applied the funds in the NJCB CD Account to repay the JLI Loan. Pl.'s Stmt. at ¶¶ 50-51; Counter Stmt. at ¶¶ 50-51. In deposition testimony, O'Donnell stated that Rabinovici had informed him that the loan should be paid off because Rabinovici did not want NJCB to be hurt. (Dkt. No. 38, Ex. F (O'Donnell Dep., 11/12/2010 at 70:2-6).

There is apparently no dispute that the events of June 2010 took place on the eve of the failure of JLSC; according to Defendants' representation at oral argument, on June 18, 2010, JLSC had already been ordered to cease operations. JLI filed its bankruptcy petition on July 30, 2010, about 35 days after the June 25 Transfer. JLSC followed on September 24, 2010. On March 14, 2012, the Trustee initiated this adversary proceeding regarding the $2 million

5

transferred from Hopewell Valley to NJCB on June 25, 2010 (the NJCB Transfer).  Complaint at ¶ 1.  The instant motions followed.

**Discussion**

## I.      Introduction

The principal issues in this case are raised by the motions to dismiss of certain of the Defendants and the Trustee's motion for summary judgment on the preference and fraudulent conveyance counts.  In brief, the Trustee asserts that the collateralization of JLSC's debt for the benefit of its parent, shortly before the bankruptcy filing of both the parent and the subsidiary, was a fraudulent conveyance because JLSC received absolutely no consideration for taking on the obligation.  If there was consideration, the Trustee further argues, then the collateralization was a preference as a payment on an antecedent obligation.  Defendants argue that the collateralization falls in a gap between preference and fraudulent conveyance law.  Their best argument is that the collateralization cannot be avoided because there was fair value for fraudulent conveyance purposes but no antecedent debt for preference purposes.  They also contend that it falls outside the 90-day look-back period for preference liability, and that the Trustee does not have standing to sue on a claim of aiding and abetting a breach of fiduciary duty.

The Court finds that, on this record, the Trustee has established that the collateralization at issue was a preference.  On the only preference issues that are open to serious dispute, the Trustee has established that the collateralization of debt that occurred on June 25, 2010 was a transfer on account of an antecedent debt owed by the debtor before such transfer was made and that it was made within the 90-day look-back period.  If, however, there was no antecedent

liability (as the Defendants argue), then the transfer was a fraudulent conveyance.  There is no

gap – on this record, it is one or the other.

Finally, the motion to dismiss the claim of aiding and abetting a breach of fiduciary duty

cannot be decided on the present record, as it is impossible to determine, on the pleadings, which

state law would apply to these claims.

## II.       The Legal Standard

The legal standards governing the motions to dismiss and for summary judgment are not in

substantial dispute.

### A.  Motion to Dismiss

A motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable by Bankruptcy Rule

7012(b), is "designed to test the legal sufficiency of the complaint, and thus does not require the

Court to examine the evidence at issue."  *DeJesus v. Sears, Roebuck & Co*., 87 F.3d 65, 69 (2d

Cir.1996) (citation omitted), *cert. denied*, 519 U.S. 1007 (1996); *see also Ryder Energy Distrib.

Corp. v. Merrill Lynch Commodities, Inc*., 748 F.2d 774, 779 (2d Cir.1984).  "It is elementary

that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences

favorable to the pleader."  *Yoder v. Orthomolecular Nutrition Inst., Inc*., 751 F.2d 555, 562 (2d

Cir.1985), citing *Conely v. Gibson*, 355 U.S. 41, 47–48 (1957).

Although a complaint need not include detailed factual allegations, the plaintiff must

incorporate "more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  "Factual

allegations must be enough to raise a right to relief above the speculative level . . . on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id*.; *see

also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).  "Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 546; *accord Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

Fed. R. Civ. P. 8(a)(2) requires that most complaints contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." In accordance with the liberal pleading standards of Rule 8, "a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'" *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir.2000), quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991). A complaint charging a defendant with an intentional fraudulent conveyance must meet the stricter standards of Fed. R. Civ. P. 9(b), but a charge of constructive fraud (as in the present case) requires only compliance with Rule 8, made applicable by Bankruptcy Rule 7008. *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox, Inc.)*, 429 B.R. 73, 96 (Bankr. S.D.N.Y. 2010).

### B. Motion for Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Morenz v. Wilson–Coker*, 415 F.3d 230, 234 (2d Cir. 2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing

the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, once there is a

showing of the absence of an issue of fact, the opposing party must produce specific evidence

that raises a genuine issue.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986).  A fact is "material" if it might affect the outcome of the suit under the

governing substantive law, and "summary judgment will not lie if the dispute about a material

fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.     Motion for Summary Judgment on Counts Three, Four, and Five

The Trustee moves for summary judgment on Complaint Counts Three (fraudulent

conveyance under §548), Four (fraudulent conveyance under § 544 of the Bankruptcy Code and

New York Debtor & Creditor Law §§ 270-76), and Five (avoidance of a preferential transfer

under § 547).

We deal first with the motion for summary judgment on the preference count.  We also

accept the premise of the motion, which is brought under § 547 of the Bankruptcy Code, that

JLSC is the proper plaintiff on this claim against NJCB, based on the fact that the $2,000,000

transferred to NJCB, deposited subject to the pre-existing "Assignment of Deposit Account" and

then set off or applied to JLI's debt, was JLSC's property.[2]

### A.  Preference Claim Under § 547

11 U.S.C. § 547(b) sets out the requirements for pleading a *prima facie* preference claim:

> Except as provided in subsections (c) and (i) of this section, the trustee
> may avoid any transfer of an interest of the debtor in property--

---

[2]Both parties have briefed and argued the motion to dismiss as if the preference claim belongs only to Debtor JLSC, which owned the $2 million transferred to NJCB on June 25, 2010.  Nevertheless, the Complaint seems to bring the preference claim on behalf of both Debtors.  We do not reach the question whether JLI would have a preference claim on account of the June 25, 2010 transfer, when its debt to NJCB became a secured rather than an unsecured debt, and its liability to its subsidiary on account of the intercompany transfer increased dramatically (or the value of its investment in its subsidiary decreased accordingly).  Moreover, we do not consider whether the application of the collateral to the JLI debt on June 28, 2010 was a preferential setoff under Bankruptcy Code § 553.

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The Trustee alleges that the NJCB Transfer was a preferential transfer avoidable pursuant to 11 U.S.C. § 547 because it caused $2 million of JLSC's property to become collateral for a debt that was unsecured immediately before the transfer.[3]  The result is that NJCB purported to be a secured rather than unsecured creditor and almost immediately offset the collateral or applied it to the debt.  On the facts of record, the requirements of § 547(b)(1), (3) and (5) are easily resolved in the Trustee's favor on his motion, as is the requirement of the lead-in clause of § 547(b) that the debtor have an interest in the property.

### i.  Whether the Debtor JLSC had an Interest in Property (§ 547(b))

It is not disputed that JLSC had an interest in the $2 million of its property when the funds were transferred into the NJCB CD Account on June 25, 2010, and pledged as collateral for the JLI Loan.  Pl.'s Stmt. at ¶¶ 37, 48; Counter Stmt. at ¶¶ 37, 48.  Nor were there any other liens against the funds, as it is not disputed that Roma Bank transferred the funds to Hopewell

---

[3] $100,000 of JLSC's funds had remained at NJCB throughout and continued to collateralize the debt.  Nothing herein implies that the deposit of $100,000 was an avoidable preference, as it took place long before the 90-day look-back period.

Valley free and clear of all liens.  Pl.'s Stmt. at ¶¶ 38, 40; Counter Stmt. at ¶¶ 38, 40.  Hopewell

Valley had no claim against JLI or JLSC, and there is no contention to the contrary.

NJCB argues that it had "a lien on the [NJCB Account] and all proceeds, replacements,

and substitutes thereof at all relevant times," and it contends that the funds continued to be

"proceeds" of its collateral as they were transferred to and from Roma Bank and then to and

from Hopewell Valley Bank.  This argument is also without merit.  The funds had not been

collateral of NJCB for almost a year, since July 2009 when they became collateral for the Roma

Bank L/C.  At that point they were not subject to the Assignment of Deposit Account, and as

noted above, it is not disputed that Roma Bank released the $2 million free and clear of any liens.

NJCB cites an example in the comments to UCC § 9-332 to support its proposition that the

money constituted proceeds of the NJCB Account and that NJCB maintained a security interest

in the proceeds.  However, UCC § 9-315, which is cross-referenced in the UCC example, makes

it clear that any security interest in cash proceeds is temporary, usually limited to 20 days.

Moreover, UCC § 9-312(b)(1) provides that "a security interest in a deposit account may be

perfected only by control under Section 9-314."  UCC. § 9-312(b)(1).  NJCB did not have

control over the money when it was released from the NJCB Account into an account in JLSC's

name at Roma Bank and then released by Roma Bank.  UCC § 9-332(b) further provides that "a

transferee of funds from a deposit account takes the funds free of a security interest in the deposit

account unless the transferee acts in collusion with the debtor in violating the rights of the

secured party."  UCC § 9-332(b).  There is no allegation of collusion, and the statute thus makes

clear that when the money was transferred from the NJCB Account into an account at Roma

Bank, it was free from NJCB's lien.  NJCB has not cited any case that supports its theory that a

lender can have a continuing lien on cash that it released years before.

ii      **Whether the Transfer was Made to or for the Benefit of a Creditor (§ 547(b)(1))**

It is not disputed that the NJCB Transfer was made for NJCB's benefit.  When asked whether the funds "came back for New Jersey Community Bank's benefit," O'Donnell stated "[y]es,…but deposited to [JLSC's] security account."  O'Donnell 2004 Examination at 225 3-7, Docket No. 38-6 at 49.  NJCB nevertheless disputes that it was a creditor of JLSC because it had loaned $2.1 million to JLI and had no *in personam* claim against JLSC.  This is not determinative, as NJCB had the right to satisfy JLI's debt from property posted by JLSC on a non-recourse basis pursuant to the Assignment of Deposit Account, dated May 28, 2009.  (Dkt. No. 38, Ex. F-3).  Under § 102(2) of the Bankruptcy Code, "'claim against the debtor' includes claim against property of the debtor."  *See Johnson v. Home State* Bank, 501 U.S. 78 (1991).[4] NJCB had a claim against JLSC's property that arose before the order for relief, and as an "entity that has a claim against the debtor" NJCB is a creditor within the meaning of § 101(10)(A) of the Bankruptcy Code.[5]

iii.      **Whether the Transfer was Made while the Debtor was Insolvent (§ 547(b)(3))**

Section 547 provides that "[f]or the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."  11 U.S.C. § 547(f).  Defendants do not challenge or proffer any evidence or argument that JLSC was not insolvent on the transfer date.[6]

---

[4] Moreover, under § 1111(a) of the Bankruptcy Code, a party in NJCB's position, with a non-recourse claim in a chapter 11 case against collateral posted by a debtor, becomes a recourse creditor with an allowable claim.  *See In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 599 (7th Cir. 2013).

[5] Creditor is defined in § 101(10)(A) of the Bankruptcy Code as
     (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor.

[6] The calculation of the 90-day period is discussed below.

### iv.    Whether the Transfer Enables Such Creditor to Receive More than Such Creditor Would Receive Under Chapter 7 (§ 547(b)(3))

"To compare what the creditor would have received in a Chapter 7 liquidation with what it received pre-petition, it is necessary to consider how the debt would have been treated in a Chapter 7 liquidation." *Braniff Airways, Inc. v. Exxon Co. U.S.A.*, 814 F.2d 1030, 1034 (5th Cir. 1987), *citing In re Mason and Dixon Lines, Inc.*, 65 B.R. 973, 976 (Bankr. M.D.N.C. 1986); *see also In re McLean Industries, Inc.*, 162 B.R. 410, 422-23 (S.D.N.Y. 1993), *rev'd on other grounds*, 30 F.3d 385 (2d Cir. 1994). The only defense raised by NJCB on this branch of the motion is that NJCB would have been paid in full in a liquidation of either JLSC or JLI because the Roma L/C remained outstanding for months after the NJCB Transfer, and there is nothing in the record to indicate that NJCB could not have drawn on it and been paid in full.

NJCB's rights against Roma Bank, however, are not determinative. The test in § 547(b)(1) is whether the transfer allowed the creditor to "receive *property of the debtor* that it would not have received in a Chapter 7 liquidation." (emphasis added). In *In re Wedtech Corp.*, 187 B.R. 105, 107-08 (S.D.N.Y. 1995), the District Court rejected the argument that the debtor's payment to a creditor within the 90-day preference period did not result in the creditor receiving more than it would have received in a Chapter 7 liquidation because the creditor's loan was secured by property of a non-debtor third party. *Id.* The district court reasoned that the debtor's transfer of funds to the creditor resulted in the creditor's receipt of property of the *debtor* that it would not otherwise have received in a Chapter 7 liquidation, and that it was irrelevant that the creditor had, prior to the transfer, protection from a third party.

The same principle applies here. At the time of the NJCB Transfer, Roma Bank had released the $2 million of JLSC's collateral. If the subsequent NJCB Transfer had not occurred, the NJCB debt would not have been collateralized by the $2 million deposited into the NJCB CD

13

Account.  Rather, NJCB would have had a loan secured by $100,000 in the NJCB CD Account and protected by, but not collateralized by, the Roma L/C.  In a Chapter 7 liquidation, NJCB would only be entitled to the $100,000 in the NJCB CD Account, and the remainder of the debt owed under the JLI Loan would be unsecured (if not collected from a draw on the Roma L/C).  It is correct, as NJCB argues, that the Roma Bank L/C remained outstanding for many months after the challenged transfer of funds.  However, NJCB has not provided any authority to support the proposition that its decision to apply JLSC's funds to the debt rather than draw on the Roma Bank L/C releases it from preference liability.  NJCB did, therefore, "receive *property of the debtor* that it would not have received in a Chapter 7 liquidation."  *In re Wedtech Corp.*, 187 B.R. at 108.

As discussed above, several of the requirements for stating a *prima facie* preference claim are easily satisfied.  Two require more extensive analysis:  § 547(b)(2), providing that the transfer be "for or on account of an antecedent debt owed by the debtor before such transfer was made," and § 547(b)(4), requiring that the transfer be made within 90 days before the petition date.

### i. Whether the Transfer was Made for or on Account of an Antecedent Debt Owed by the Debtor Before Such Transfer was Made (§ 547(b)(2))

"Debt" is defined in § 101(12) of the Bankruptcy Code as "liability on a claim."  A claim is defined in § 101(5)(A) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  There is no dispute that the debt to NJCB was owed by JLI.  JLI had borrowed the funds, and its subsidiary JLSC had never guaranteed the debt.  However, as noted above, under § 102(2), "claim" includes a claim against property of the

14

debtor.  In order to establish his *prima facie* preference claim, the Trustee must show only that the transfer was made for or on account of an antecedent claim against JLSC's property.

The Trustee can make this showing because it is undisputed that JLSC had initially deposited its property – $2.1 million of funds borrowed – in support of its parent's obligation and had executed a continuing Assignment of Deposit Account agreement by which it agreed that collateral for the debt would include all additional deposits made to the Account.  The fact that the collateral posted at NJCB had been released by NJCB prior to the transfer and no longer served as collateral for JLI's debt did not mean that JLSC had no liability to NJCB in respect of the $2,000,000, or that NJCB had no "claim" against JLSC's property.  NJCB's claim to JLSC's property was documented in the Assignment of Deposit Account, which provided that collateral would include "all additional deposits hereafter made to the Account," and this gave NJCB the right to collateralize the JLI loan with the property of a JLI subsidiary.

Moreover, if JLSC had no obligation whatsoever to NJCB at the time of the NJCB Transfer, as NJCB argues, an insolvent JLSC's use of its property to secure its parent's debt would be a classic fraudulent conveyance.[7]  Indeed, if Rabinovici had used $2,000,000 belonging to an insolvent non-debtor company he controlled to collateralize a loan to one of his other companies, he might arguably be liable for aiding and abetting a fraudulent conveyance (assuming the existence of such a cause of action).  However, JLSC was not a stranger to the transaction, and the $2,000,000 was deposited into the pre-existing NJCB CD Account in accordance with the agreement governing that account.  It was also lawfully deposited because JLSC had arguably received consideration for the use of its money to collateralize its parent's obligation – it had received the proceeds of the loan, at least formally.  JLSC's liability under the NJCB CD Account Agreement, coupled with its status as a beneficiary of the borrowing, meant

---

[7] See also discussion below at section III-B.

that there was a basis for Defendants to use JLSC's property to collateralize its parent's debt, and this liability constituted an antecedent debt within the meaning of § 547(b)(2).

> **ii      Whether the Transfer was Made on or within 90 Days Before the Date of the Filing of the Petition**

The second serious issue raised by Defendants is whether the NJCB Transfer was made within 90 days before the date of the filing of the bankruptcy petition by JLSC. This is the subject of the motion to dismiss filed by NJCB, the sole defendant on the preference claim, and it is based on the fact that JLSC filed its bankruptcy petition with this Court on September 24, 2010, which is 91 or 92 calendar days after the transfer on June 25, depending on whether the petition date is counted. Defendant NJCB argues that the transfer was accordingly outside the preference period for a non-insider such as NJCB.[8]

The issue involves the application of Bankruptcy Rule 9006, which, as amended in 2009, provides, in pertinent part:

> (a) Computing time
> The following rules apply in computing any time period specified in these rules, in the Federal Rules of Civil Procedure, *in any local rule or court order, or in any statute that does not specify a method of computing time.*
> > (1) Period Stated in Days or a Longer Unit. When the period is stated in days or a longer unit of time:
> > > (A) exclude the day of the event that triggers the period;
> > > (B) count every day, including intermediate Saturdays, Sundays, and legal holidays; and
> > > (C) *include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.* Fed. R. Bankr. P. 9006 (emphasis added).

If Bankruptcy Rule 9006 is applied as written, the challenged transfer took place within the 90-day look back period of § 547(b) of the Bankruptcy Code, as the petition was filed on September 24, 2010, and the 90th calendar day earlier (not counting the date of the chapter 11 petition) fell

---

[8] For an insider, the preference period is a year. 11 U.S.C. § 547(b)(4)(B).

on Saturday, June 26, 2010. Under Rule 9006(a)(1)(C) "the period [would] continue[ ] to run" until the end of the following weekday counting backward, which was Friday, June 25. If Bankruptcy Rule 9006 is ignored, the transfer on June 25 took place either 91 or 92 calendar days before the petition date, depending on whether the date of the petition is counted.[9]

For their argument that Rule 9006 should not be applied, Defendants rely primarily on *In re Greene*, 223 F.3d 1064 (9th Cir. 2000). There the majority first held that § 547(b)(4)(A) is not an "applicable statute" to which the rule applied, construing the rule as it read before the 2009 amendment. *Id*. at 1068-69.[10] The Court then held that under the Rules Enabling Act, Rule 9006 could not increase the 90-day period for avoidance of a preferential transfer because such a construction would "abridge, enlarge, or modify [a] substantive right." *Id*., quoting 28 U.S.C. § 2075. The Court reasoned that a litigant's right to escape preference liability based on the premise that the transfer took place more than 90 calendar days before the bankruptcy filing is substantive, and that the trustee's rights under § 547(b)(4)(A) would be enlarged if the rule were applied. The third judge on the *Greene* panel disagreed on both points. He noted that Fed. R. Civ. P. 6(a) had been applied to enlarge the period for filing a lawsuit, notwithstanding the Rules Enabling Act, and noted that "procedural rules 'may and often do affect the rights of litigants.'" 223 F.3d at 1074, quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). He also found

---

[9] The setoff or application of the collateral to the debt took place later. We do not consider whether this took place within the 90-day look-back period of § 553(b) of the Bankruptcy Code.

[10] The version of the rule in effect when *Greene* was decided read as follows:
Computation. In computing any period of time prescribed or allowed *by these rules, by the local rules, by order of court, or by any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included*. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days. When the period of time prescribed or allowed is less than 8 days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation. As used in this rule and in Rule 5001(c), "legal holiday" includes New Year's Day, Birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, and any other day appointed as a holiday by the President or the Congress of the United States, or by the state in which the bankruptcy court is held. (emphasis added).

unpersuasive the majority's contention that application of the rule in the preference period

context would be unreasonable because no affirmative act is required when one counts

backward, and thus a litigant need not be concerned that a court clerk's office might be closed on

the day on which a filing deadline fell.

*Greene* is contrary to a line of cases, including one in this court, that applied Bankruptcy

Rule 9006 as it read before the 2009 Amendments to the calculation of the look-back period in a

preference avoidance action.  *See Matter of Nelson Co.*, 959 F.2d 1260, 1266 (3d Cir. 1992)

(applying Rule 9006 to calculate the 90-day preference period by not counting the day of the

"event"); *Harbor Nat. Bank of Boston v. Sid Kumins, Inc.*, 696 F.2d 9 (1st Cir. 1982) (applying

Bankruptcy Rule 906(a), the predecessor to current Bankruptcy Rule 9006(a), in calculating the

preference period); *In re Levinson*, 128 B.R. 365 (Bankr. S.D.N.Y. 1991) (applying Bankruptcy

Rule 9006 in determining whether the defendant-creditor received a voidable preference, where

the transfer in question, a judgment lien against the debtor's real estate, occurred on November

15, 1990 and the chapter 13 petition was filed on February 13, 1991); *In re J.A.S. Markets, Inc.*,

113 B.R. 193, 197-98 (Bankr. W.D. Pa. 1990) (applying Rule 9006(a) to count backwards from

the filing date; because the ninetieth day fell on a Saturday, the Court held that the preceding

Friday was within the 90-day period).

No reported cases have been found that have applied Bankruptcy Rule 9006 since the

2009 Amendments, but it is relevant that part of the reasoning of the *Greene* majority is no

longer valid.  The *Greene* majority opinion was premised in part on the proposition that the

preference law was not an "applicable statute" for purposes of former rule 9006, and it is no

longer good law to that extent.  The 2009 Amendment provides that Rule 9006 applies to the

calculation of time "in any statute that does not specify a method of computing time" rather than

in "any applicable statute."  The Advisory Note to the 2009 Amendment explains: "Under new

subdivision (a)(1), all deadlines stated in days (no matter the length) are computed in the same

way.  The day of the event that triggers the deadline is not counted.  All other days--including

intermediate Saturdays, Sundays, and legal holidays--are counted, with only one exception: If the

period ends on a Saturday, Sunday, or legal holiday, then the deadline falls on the next day that

is not a Saturday, Sunday, or legal holiday."  Thus, to the extent that *Greene* was premised on the

proposition that Rule 9006 enlarges substantive rights, the 2009 amendment explains that the

Rule is intended to give substance to all methods of calculating time not otherwise specified in a

statute.  The preference law does not specify that "calendar days" be used in the calculation of

the look-back period; § 547(b)(4) refers only to "days," providing no method of calculation.

Rule 9006 affects a substantial right of a party only if one inserts the word "calendar" in

§ 547(b)(4).  Rule 9006 in effect instructs the court and the parties as to how to count days where

the statute does not provide a method.  This is the critical factor that establishes that the rule

should be applied as written and that its application does not violate the Rules Enabling Act by

altering "substantive rights."

The Ninth Circuit's holding in *Greene* also cannot be reconciled with a line of cases in

this circuit construing Fed. R. Civ. P. 6(a).[11]  Bankruptcy Rule 9006 is nearly identical to Fed. R.

---

[11] Rule 6 of the Federal Rules of Civil Procedure reads, in pertinent part:
    (a) Computing Time. The following rules apply in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time.
        (1) Period Stated in Days or a Longer Unit. When the period is stated in days or a longer unit of time:
            (A) exclude the day of the event that triggers the period;
            (B) count every day, including intermediate Saturdays, Sundays, and legal holidays; and
            (C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday….

Civ. P. 6, and it was so before the 2009 amendments; the 2009 amendments to both became

effective on December 1, 2009. Courts in this circuit have frequently applied Fed. R. Civ. P.

6(a)(1)(C) to hold events timely where the last day fell on a Saturday, Sunday, or legal holiday

and the event occurred the following Monday. *See Tiberio v. Allergy Asthma Immunology of

Rochester*, 664 F. 3d 35, 37 (2d Cir. 2011) (stating that Fed. R. Civ. P. 6 applies to the ninety-

day period to file a complaint after receipt of an EEOC right-to-sue letter but that plaintiff's

complaint fell outside this period); *Taylor v. Fresh Direct*, 2012 WL 6053712, *3-4 (S.D.N.Y.

Dec. 5, 2012) (stating that the ninety-day period in which a complaint must be filed following

receipt of an EEOC right-to-sue letter expired on January 3, 2012, where January 1 and January

2 were both legal holidays); *Toliver v. City of New York*, 2012 WL 6849720, *3 n.10 (S.D.N.Y.

Sept. 25, 2012) (stating that the 120-day period in which service must be completed expired on

Monday, June 18, 2012, where the 120th day after the February 17, 2012 filing date fell on June

16, 2012, a Saturday). Other courts have similarly applied Rule 6(a)(1)(C) of the Federal Rules

of Civil Procedure to hold actions mandated by a statute timely where the last day fell on a

Saturday, Sunday, or legal holiday and the event occurred the following Monday. *See, e.g.,*

*Edwards v. Bat State Milling Co.,* 519 Fed. Appx. 746, 748 (3d Cir. 2013) (stating that the

ninety-day period in which a complaint must be filed following receipt of an EEOC right-to-sue

letter expired on Monday, April 5, 2010, where the 90th calendar day fell on Saturday, April 3,

2010).

Defendants finally contend that the foregoing cases and the provisions of Bankruptcy

Rule 9006 and Fed. R. Civ. P. 6 should not apply in any event because the preference statute

requires counting backwards. Defendants note that JLSC's petition was filed on a weekday and

---

(5) "Next Day" Defined. The "next day" is determined by continuing to count forward
when the period is measured after an event and backward when measured before an
event. Fed. R. Civ. P. Rule 6(a)(1), (5).

the prior transfer took place on a Friday; in their view, the Debtor was not "prevented" from filing its petition by the fact that the "deadline" occurred on a weekend. Defendants' argument is similar to that of the *Greene* majority, which reasoned that Bankruptcy Rule 9006 should not apply when calculating backward because the date of the filing in court (the bankruptcy petition) would not fall on a weekend or holiday. Defendants also note that if we count forward from the date of the NJCB Transfer on June 25, 2010, the 90-day period expired on Thursday, September 23, 2010, one day before JLSC filed its bankruptcy petition.

Defendants' final argument is unpersuasive. It has long been settled that in calculating the relevant preference period a court should count backwards from the date of the petition. *Matter of Nelson Co.*, 959 F.2d 1260, 1266-67 (3d Cir. 1992); *In re Antweil*, 97 B.R. 63, 63 (Bankr. D.N.M. 1988); *In re Enterprise Fabricators, Inc.*, 36 B.R. 220, 221 (Bankr. D. Tenn. 1983). The Advisory Committee Notes to the 2009 Amendments also state that a look-back period should be calculated in accordance with the Rule. See 2009 Advisory Committee Notes to Subdivision (a)(5) of Rule 9006 ("A backward-looking time period requires something to be done within a period of time before an event.") As to the contention that Bankruptcy Rule 9006 should be applied only where the triggering event might be impeded by a weekend closure of a clerk's office, it is relevant that when Bankruptcy Rule 9006 was amended in 2009, it was commonplace to file complaints electronically, a step that can be taken on a Saturday, Sunday or holiday. An original purpose of Fed. R. Civ. P. 6 and Bankruptcy Rule 9006 may have been related to court closure or the fact that some take the idea of a day of rest very seriously. Nevertheless, the Rule also serves to provide a uniform method of calculation of time periods that can be used and relied on where the statute does not specify that "days" means "calendar days." To parse the Rule and only apply it when a court filing cannot be made because the

21

deadline fell on a day other than a regular business day would deprive the rule of uniformity and certainty. Uniformity and certainty are critical in the application of any rule. Bankruptcy Rule 9006 should be applied as written, and Defendants' motion to dismiss Count I for failure to satisfy § 547(b)(4) is denied.

Based on the foregoing, the Trustee has made out a *prima facie* case as to preference liability. Subsection (c) of § 547 sets forth the defenses to preference liability.[12] The only statutory defenses raised by Defendants are under §§ 547(c)(1) and (4).[13]

### i. Whether the Transfer was a Contemporaneous Exchange for New Value

Section 547(c)(1) provides that a trustee (or debtor in possession) may not avoid a transfer "to the extent that such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1). NJCB argues that "in exchange for the NJCB Transfer, NJCB immediately credited JLSC's account in the amount of $2 million. . . . That credit was a payment obligation of NJCB to JLSC." The reasoning is specious. The NJCB Transfer resulted in collateralization of the JLI Loan by increasing the NJCB CD Account, security for the JLI Loan, by $2 million. JLSC did

---

[12] 11 U.S.C. § 547(c) provides in pertinent part:

The trustee may not avoid under this section a transfer--
(1) to the extent that such transfer was--
   (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
   (B) in fact a substantially contemporaneous exchange;
      . . .
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
   (A) not secured by an otherwise unavoidable security interest; and
   (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor…   11 U.S.C. § 547(c)(1), (2), (4).

[13] Defendants raised the ordinary course business defense of § 547(c)(2) in their answer but did not brief it. It is accordingly deemed waived. *Guzman v. Macy's Retail Holdings, Inc.*, 2010 WL 1222044 at *9 (S.D.N.Y. 2010).

not receive "new value" in return for this collateralization.  The NJCB transfer burdened JLSC's

property by purporting to make it collateral for the loan to JLI.

### ii.   Whether the Creditor Gave New Value to or For the Benefit of the Debtor after the Transfer

NJCB argues if the $2 million credit to the NJCB Account does not fall under

§ 547(c)(1), it must fall within § 547(c)(4), which provides a defense to a preference claim if the

creditor gave new value to the debtor subsequent to the claimed preferential transfer.  According

to NJCB, JLSC received the benefit of a $2 million "credit" to its account.  This contention is

also without the slightest basis.  As noted above, the preference in this case resulted from the

further collateralization of the JLI Loan.  No new value was given by NJCB in exchange for this

encumbrance.

Based on the foregoing, the Trustee is entitled to summary judgment on his preference

claim.

### B.  Fraudulent Conveyance Claim Under § 548

Section 548(a)(1) provides,

> (a)(1) The trustee may avoid any transfer (including any transfer to or for
> the benefit of an insider under an employment contract) of an interest of the
> debtor in property, or any obligation (including any obligation to or for the benefit
> of an insider under an employment contract) incurred by the debtor, that was
> made or incurred on or within 2 years before the date of the filing of the petition,
> if the debtor voluntarily or involuntarily--
>> (A) made such transfer or incurred such obligation with actual
>> intent to hinder, delay, or defraud any entity to which the debtor
>> was or became, on or after the date that such transfer was made or
>> such obligation was incurred, indebted; or
>> (B)(i) received less than a reasonably equivalent value in exchange
>> for such transfer or obligation; and
>>> (ii)  (I) was insolvent on the date that such transfer was made or
>>> such obligation was incurred, or became insolvent as a
>>> result of such transfer or obligation;
>>> (II) was engaged in business or a transaction, or was about
>>> to engage in business or a transaction, for which any

> property remaining with the debtor was an unreasonably
> small capital;
> (III) intended to incur, or believed that the debtor would
> incur, debts that would be beyond the debtor's ability to pay
> as such debts matured; or
> (IV) made such transfer to or for the benefit of an insider,
> or incurred such obligation to or for the benefit of an
> insider, under an employment contract and not in the
> ordinary course of business.  11 U.S.C. § 548(a)(1).

The Trustee argues that the transfer of $2 million from JLSC's account at Hopewell

Valley into the NJCB Account was a fraudulent conveyance because (1) JLSC had an interest in

the funds, (2) the transfer occurred within two years before the date of the filing of the petition,

(3) JLSC received less than reasonably equivalent value in exchange for the transfer, and (4)

JLSC was insolvent at the time of the NJCB Transfer.

### i.   Whether JLSC had an Interest in the Property

For the reasons set forth above relating to the preference claim, JLSC had an interest in

the property.

### ii.   Whether the Transfer Occurred Within Two Years of the Filing of the Petition

The transfer at issue occurred on June 25, 2010.  Pl.'s Stmt. at ¶ 47; Counter Stmt. at ¶

47.  JLSC filed its bankruptcy petition on September 24, 2010.  Pl.'s Stmt. at ¶ 4; Counter Stmt.

at ¶ 4.  There is no dispute that the transfer at issue occurred within two years of the filing of the

bankruptcy petition.

### iii.   Whether JLSC Received Less than Reasonably Equivalent Value for the NJCB Transfer

"Reasonably equivalent value" is not defined in the Bankruptcy Code.  "Value" is

defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but

does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). Whether the debtor received "reasonably equivalent value" for the alleged fraudulent transfer is ordinarily a question of fact. *In re Adelphia Comm. Corp.*, 2006 WL 687153 at *11 (Bankr. S.D.N.Y. Mar. 6, 2006) (*citing Satriale v. Key Bank USA* (*In re Burry*), 309 B.R. 130, 137 (Bankr. E.D. Pa. 2004). Where, however, a debtor receives no value for an alleged conveyance, a court may find that the transfer was fraudulent, as a matter of law, as long as the other elements in § 548 are satisfied. *See Mellon Bank v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 149-150 (3d Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all."); *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co)*, 435 B.R. 866, 876 (Bankr. S.D.N.Y. 2010) (grant of summary judgment); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 421 (Bankr. S.D.N.Y.2007) ("[s]ince no 'value' was received, the Debtor could not have received 'reasonably equivalent value'"); *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, No. 02–41729(CGM), 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006) ("In determining value, the Court makes a two fold inquiry: whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and whether that value was in fact reasonably equivalent. . . .")

The Trustee argues that the debtor received no "value" for the transfer because JLSC was not obligated to NJCB under the JLI Loan or, stated differently, JLSC did not owe an antecedent debt to NJCB at the time of the NJCB Transfer. NJCB argues that JLSC did receive "value" in exchange for the NJCB Transfer in the form of (1) a credit to the NJCB Account for the amount

of the transfer, (2) the third party benefit to JLI for collateralization and repayment of the JLI

Loan, or (3) forbearance from NJCB's exercising of its rights under the JLI Loan. They are both

wrong. The Trustee is wrong because, as discussed above, JLSC received the proceeds of the

original loan when they were downstreamed by JLI. In return, JLSC signed the open-ended

NJCB CD Account agreement that the Bank could use its property and any further deposits to

collateralize the loan.[14]

Defendants are wrong because they misstate – perhaps with the preference claim in mind

– the value that JLSC received. The credit of the funds to JLSC's account did not provide JLSC

with any value because the alleged fraudulent conveyance was not the funds transfer but the

pledge of the funds, making them subject to the NJCB lien.[15] Similarly, Defendants do not have

a fraudulent conveyance defense merely because there was a benefit to JLI. "[T]ransfers made

or obligations incurred solely for the benefit of third parties do not furnish reasonably equivalent

value, unless the debtor's net worth is unaffected because it received a direct or indirect

economic benefit from the transfer." *In re Globe Tanker Servs., Inc.*, 151 B.R. 23, 24-25 (Bankr.

D. Conn. 1993) (citations omitted).

Defendants also argue that JLSC received value from the Bank's forbearance in

collecting its debt. The record is unclear whether there was forbearance by NJCB on its

collection of the JLI Loan. In some cases, forbearance can constitute "reasonably equivalent

value" under § 548(d)(2)(A). *See In re Silverman Laces, Inc.*, 2002 WL 31412465 (S.D.N.Y.

Oct. 24, 2005) (holding that the debtor received "reasonably equivalent value" when the creditor

---

[14] If the Trustee were correct on his claim that JLSC received no value from the transfer, the Trustee would lose on his preference claim, as discussed above, but he would have at least a sound basis for his fraudulent conveyance claim.

[15] See discussion above at pp. 4, 15-16. On June 24, JLSC's $2 million was held at Hopewell Valley free and clear of all liens. When the money was transferred into the NJCB Account on June 25, it was held as security for the JLI Loan. A credit to an account that collateralizes property for the benefit of a third party cannot be considered full value because of the name on the account.

waived its rights to pursue legal remedies for default and agreed to extend debtor's obligations in return for a security interest in debtor's inventory, *i.e.*, securing the antecedent debt); *In re Pembroke Development Corp.*, 124 B.R. 398, 400-01 (Bankr. S.D. Fla. 1991) ("In the case at hand, part of the consideration given by the creditor for the execution of the Modification Agreement was its forbearance of foreclosure on a loan that the creditor had made to Pembroke Charter Corporation."). Here, however, forbearance on the JLI loan would only constitute "value" to JLI. There certainly was no forbearance on the application of JLSC's $2 million deposit of additional collateral. It was applied to pay down the JLI debt within days of its deposit.

Nevertheless, there is a question of fact whether JLSC received reasonably equivalent value from the collateralization because its obligation dated from the time it arguably received some benefit from the transaction. There is often extensive fraudulent conveyance litigation when a subsidiary obligates itself on a debt of its parent. In this circuit, the leading case appears still to be *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991-92 (2d Cir.1981), where the Court held that where an insolvent debtor pays another party's debt, such transfer will be a constructive fraudulent conveyance unless the debtor receives an indirect benefit of reasonably equivalent value from the transfer.[16] The key consideration is whether the debtor's net worth has been preserved. *Id.* at 991; *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991) (whether "the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets

---

[16] Although *Rubin* considered the term "fair consideration" under the Bankruptcy Act of 1898, its analysis has been followed in cases considering "reasonably equivalent value" under the Bankruptcy Code. *Gen. Elec. Credit Corp. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 n. 2 (11th Cir.1990). *Rubin* has been subjected to searching analysis in Richard Squire, Strategic Liability in the Corporate Group, 78 U. Chi. L. Rev. 605, 651-54 (2011), but is binding authority in this circuit.

transferred"); *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012).

A finding of reasonably equivalent value does not require an exact equivalent exchange of consideration. *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995). However, the benefits the debtor receives from the transfer must approximate its expected costs. *TOUSA*, 680 F.3d at 1311 (voiding transfers of liens on their assets granted by subsidiaries to secure the debt of a parent corporation where the "costs of the transaction far outweighed any perceived benefits" and "the potential benefits were nowhere close to its expected costs"); *see also Rubin*, 661 F.2d at 991-92 (where the value of the benefit received by the debtor approximates the value of the property transferred by the debtor, the net effect on the debtor's estate is insignificant). Defendants appear to argue that there was reasonably equivalent value merely because JLSC and JLI were able to continue in business. (Def. Br. at 15-18). That is not the law. The opportunity to avoid a default or bankruptcy may not necessarily constitute "reasonably equivalent value." *See TOUSA*, 680 F.3d at 1311-12 (concluding that under the facts of the case, the indirect benefit received by subsidiaries in avoiding bankruptcy did not constitute reasonably equivalent value to the liens they provided to collateralize the parent company's obligation, as it only delayed the inevitable).

Nevertheless, Defendants have raised a triable question of fact as to whether JLSC received reasonably equivalent value from the NJCB Transfer since JLSC may have received value from the JLI Loan, and it had agreed to encumber its property in support thereof. The value of indirect benefits is often difficult to quantify. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 63, (3d Cir. 1991). When considering a value dependent upon a contingent event, a court takes into consideration the likelihood of that event occurring. *Mellon*

*Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. Inc. (In re R.M.L., Inc)*, 92 F.3d
139, 148, 156 (3d Cir. 1996) (concluding that reasonably equivalent value was not present
because the record of the case showed that a commitment letter was so conditional that the
chances of a loan closing were neglible).  However, if at the time of a transfer there is a chance
that the transfer "will generate a positive return," value will be conferred.  *Id*. at 152.  Further, if
that value approximates the value of what the debtor transferred, there will be reasonably
equivalent value.

Plaintiff's motion for summary judgment on the fraudulent conveyance count must be
denied for a further reason.  Ordinarily collateralization of a legitimate debt is not a fraudulent
conveyance.  *See Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*, 2013 WL 3828509 (Bankr.
S.D.N.Y. July 23, 2013) (citing cases).  Section 548(d)(2)(A) specifically provides that value
includes "securing of a present or antecedent debt of the debtor."  To the extent JLSC owed an
antecedent debt to NJCB based on its receipt of the proceeds of the JLI Loan, there was some
value to JLSC.  Whether it constituted reasonably equivalent value cannot be determined on this
record.

### iv.   JLSC was Insolvent at the Time of the NJCB Transfer

The Trustee must also prove that the debtor "was insolvent on the date that such transfer
was made or such obligation was incurred, or became insolvent as a result of such transfer or
obligation."  11 U.S.C. § 548(a)(1)(B)(ii)(I).[17]  The Bankruptcy Code defines "insolvent" as the
"financial condition such that the sum of [an] entity's debts is greater than all of such entity's
property, at a fair valuation." 11 U.S.C. § 101(32)(A).  There is no presumption of insolvency in
a fraudulent conveyance action as there is in the preference statute.

---

[17] A plaintiff in a constructive fraudulent conveyance case can also prove that a debtor had unreasonably small
capital or was illiquid at or as a result of the transfer, but the Trustee in this case has relied on insolvency.

To prove insolvency, a trustee may rely on "balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence." *In re Knippen*, 355 B.R. 710, 722-23 (Bankr. N.D. Ill. 2006), *citing Freeland v. Enodis Corp.* (*In re Consol. Indus. Corp.*), 292 B.R. 354, 360 (N.D. Ind. 2002). If a trustee shows that the debtor was insolvent at a time subsequent to the date of the alleged fraudulent transfer, the trustee must also show that the debtors' financial condition did not change during the interim period. *See In re Crawford*, 454 B.R. 262 (Bankr. D. Mass. 2011); *In re Kaylor Equip. Rental, Inc.*, 56 B.R. 58 (Bankr. E.D. Ten.. 1985). In this case, the Trustee attempts to show that JLSC was insolvent on the NJCB Transfer date by projecting backwards from JLSC's September 24, 2010 petition date to the June 25, 2010 NJCB Transfer date.

On the instant record, the Trustee has adequately shown that JLSC was insolvent on the petition date through bankruptcy schedules and the Debtor's quarterly status reports. The schedules filed with JLSC's petition represent that JLSC was insolvent on the petition date, with assets of $2,586,059.15 and liabilities of $7,873,934.75. The Trustee also references a June 18, 2010 letter from FINRA to JLSC indicating that, as of that date, JLSC had not shown that it was in compliance with net capital requirements, and that if it did not make such a showing, it would be required to cease conducting business except to liquidate transactions. The Trustee argues that, as a result, JLSC could not have increased its assets during the period between the NJCB Transfer on June 25, 2010, and the subsequent chapter 11 filing. However, the Trustee undermines his argument because he has also introduced reports that JLSC was required to file as a broker-dealer that demonstrate that JLSC lost over $1.8 million in June 2010 and over $4.5 million in July 2010. In those two months alone, the losses JLSC sustained are greater than the difference between JLSC's assets and liabilities on the petition date.

Thus, from the evidence presented, it is not clear whether JLSC's insolvency on the

petition date was impacted by intervening events after the date of the FINRA letter.  The Trustee

is not entitled to summary judgment on the issue of insolvency and, if further proceedings are

necessary, the Trustee must establish that JLSC was insolvent at the time of the NJCB Transfer

or became insolvent as a result of it.

### v.  Defendants' Defenses

Defendants also raise an additional defense to the fraudulent conveyance count.  They

allege that the NJCB Transfer was not a fraudulent transfer because "NJCB has a lien on the

[NJCB Account] and all proceeds, replacements, and substitutes thereof at all relevant times."

The argument that the $2,000,000 was always "proceeds" of NJCB's collateral is rejected for the

reasons set forth above at p. 11.

In sum, the Trustee's motion for summary judgment on his fraudulent conveyance claim

under 11 U.S.C. § 548(a)(1)(B) is denied at this time as there are material issues of fact in

dispute.

### C.  Fraudulent Conveyance Claim Under New York Debtor & Creditor Law §§ 270-76 and § 544 of the Bankruptcy Code

New York Debtor & Creditor Law § 273 provides, "Every conveyance made and every

obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to

creditors without regard to his actual intent if the conveyance is made or the obligation is

incurred without a fair consideration."  N.Y. Debt. & Cred. Law § 273 (McKinney).  An estate

representative can access this provision through § 544(b) of the Bankruptcy Code, which

provides in pertinent part, "the trustee may avoid any transfer of an interest of the debtor in

property or any obligation incurred by the debtor that is voidable under applicable law by a

creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).

The Trustee argues that the Trustee may avoid the NJCB Transfer as a fraudulent transfer under the New York Debtor and Creditor Law but the questions of fact as to reasonably equivalent value (fair consideration under state law) and insolvency would also preclude summary judgment on this count. Further, as also discussed below, the Trustee has not established that New York law is controlling in the present case. In fact, in his filings and at the September 13, 2013 hearing, the Trustee argued that New York law does not control as far as the aiding and abetting claims are concerned. In any event, on this record it is also unclear why state law needs to be considered, inasmuch as all relevant events took place with the two-year look-back period provided under § 548.

The Trustee's motion for summary judgment on the New York Debtor and Creditor Law claim is also denied at this time.

### A. Aiding and Abetting Claim

Finally, in the Second Claim for Relief the Trustee charges NJCB and O'Donnell with aiding and abetting a breach of fiduciary duty. Complaint at ¶ 30-33. These Defendants move to dismiss this claim based upon the *Wagoner* rule, which provides that a bankruptcy trustee or estate representative does not have standing to sue third parties for damages where management of the debtor was itself primarily responsible for the misconduct. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). "The rationale underlying the *Wagoner* rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corporation*, 219 F.3d 79, 86 (2d Cir. 2000).

The *Wagoner* rule, however, is a rule of New York law, and the premise of the motion to dismiss Count II is that New York law and the *Wagoner* rule apply. The Trustee argues to the contrary and asserts that on a choice of law analysis, New York law would *not* apply. That raises the issue of the law that should apply to a claim for aiding and abetting a breach of fiduciary duty.

To perform a choice of law analysis, a bankruptcy court ordinarily applies the choice of law rules of the state in which it is located. *In re Coudert Brothers LLP,* 673 F.3d 180, 186-87 (2d Cir. 2012); *Enron Wind Energy Sys. v. Marathon Elec. Mfg. Corp. (In re Enron Corp.)*, 367 B.R. 384, 392 (Bankr. S.D.N.Y. 2007). Under New York choice of law rules, courts only engage in a choice of law analysis when there is an actual conflict between the possibly applicable laws. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). There is such a conflict in this case because the *Wagoner* rule has been rejected by many other jurisdictions. *See e.g.*, *Carr America Realty Corp. v. Nvidia Corp.*, 302 Fed. Appx. 514, 516 (9th Cir. Nov. 25, 2008) ("[T]he *Wagoner* rule has been much criticized and we decline to follow it."); *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1003 (8th Cir. 2007) ("Although *Wagoner* has been followed in the Second Circuit, it has also been criticized for characterizing an *in pari delicto* defense as a standing issue."); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 346-47 (3d Cir. 2001, *citing In re Dublin Secs., Inc*., 133 F.3d 377, 380 (6th Cir. 1997) ("An analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*. Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms.").

Courts in this district, applying New York's choice of law rules, differ on the issue of the law that should govern a claim for aiding and abetting a breach of fiduciary duty. Some courts

33

hold that the law of the jurisdiction having the greatest interest in the litigation should govern.

*Granite Partners, L.P. v. Bear, Stearns Co. Inc.*, 17 F.Supp.2d 275, 306 (S.D.N.Y.1998); *Solow v. Stone*, 994 F.Supp. 173, 177 (S.D.N.Y.1998); *Cromer Finance Ltd. v. Berger*, 2003 WL 21436164, *8–9 (S.D.N.Y.2003); *In re Adelphia Communications Corp.,* 365 B.R. 24, 40-41 (Bankr. S.D.N.Y. 2007).  Other courts have applied the internal affairs doctrine, reasoning that since the fiduciary duty of a director or officer of a corporation is established by the law of the state of incorporation, the duty of an accessory should be determined by the same legal principles.  *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980); *Lachman v. Bell*, 353 F. Supp. 37, 39-40 (S.D.N.Y. 1972); *Buckley v. Deloitte & Touche USA LLP*, 2007 WL 1491403 at *13 (S.D.N.Y. May 22, 2007), *citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 2006 U.S. Dist. LEXIS 4270, *35 (S.D.N.Y. Feb. 2, 2006); *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F.Supp.2d 123, 129 (S.D.N.Y.1999); *Lou v. Belzberg*, 728 F.Supp. 1010, 1023 (S.D.N.Y.1990).

In this case, it is not necessary to accept either line of authority because the parties do not contend that all of the possible candidates have accepted *Wagoner*, and it is impossible to determine, on the allegations of the Complaint (or the present record), which state law would apply.  If we were to apply the law of the state having the greatest interest in the dispute, the facts of record are the following.  The defendants on the count charging aiding and abetting a breach of fiduciary duty are NJCB and O'Donnell, the movants.  At the Hearing the parties agreed that NJCB is located in New Jersey.  All acts of O'Donnell occurred in New Jersey.  JLSC operated out of thirteen offices; four of these offices were located in Florida, three were in New Jersey, and one was in New York.  Rabinovici, the CEO of both Debtors, was apparently located in New York, and communications from Rabinovici were from New York.

34

On these facts, it is impossible to determine whether Rabinovici's location in New York would make New York the jurisdiction with the greatest interest in the litigation.  If New Jersey had the greater interest, the *Wagoner* rule would not apply, as New Jersey seems to have rejected it.[18]  Florida courts have held that the *in pari delicto* defense should not be determined on a motion to dismiss.[19]

As for the internal affairs doctrine, neither JLI nor JLSC was incorporated in New York.  JLSC was incorporated in the State of Washington.  JLI was incorporated in Florida.  *Wagoner* seems also to have been rejected in the State of Washington.[20]

On a motion to dismiss, a court is required to accept the well-pleaded allegations of the complaint as true.  Where a choice of law determination cannot be made based on the pleadings, the motion should be denied, without prejudice, leaving the material facts for later determination.  *Commerce and Indus. Ins. Co. v. U. S. Bank Nat. Ass'n*, No. 07 Civ. 5731 (JGK) 2008 WL 4178474, *7-8 (S.D.N.Y. Sept. 3, 2008) (denying motion to dismiss complaint when record was unclear how choice of law analysis would be resolved but affording parties opportunity for further briefing on issue for later determination).  The motion to dismiss Count II is, therefore, denied without prejudice.

---

[18] *See NCP Litig. Trust v. KPMG LLP*, 187 N.J. 353, 384 (NJ 2006) (holding that imputation of a corporate officer's fraud to the corporation does not bar a claim against a negligent third-party, and determining that a bankruptcy representative who acts for innocent shareholders is entitled to pursue a claim against a negligent auditor, with the auditor then afforded the opportunity to raise a defense of comparative fault).

[19] *See, e.g.*, *World Capita Comm., Inc. v. Island Capital Mgmt. (In re Skyway Commc'ns Holding Corp.)*, 389 B.R. 801, 810-811 (Bankr. M.D. Fla. 2008) (the *in pari delicto* defense is not suitable for disposition on a motion to dismiss because it is not "an absolute standard" to be applied in every situation, rather, the factual record must be developed to balance the parties' relative fault); *Welt v. Efloor Trade, LLC (In re Phoenix Diversified Inv. Corp.)*, 439 B.R. 231, 242 (Bankr. S.D. Fl. 2010) (although seldom appropriate to determine on a motion to dismiss, the *in pari delicto* defense can be asserted if the facts establishing it "(1) are definitively ascertainable from the complaint and other allowable sources of information, and (2) suffice to establish the affirmative defense with certitude."

[20] In *Goldberg v. Sanglier*, 96 Wash.2d 874, 883 (Wash. 1982), the Court said "a decision as to whether a party is *in pari delicto* relies on public policy considerations."

## Conclusion

For the foregoing reasons, the pending motions are decided as follows.  Applying Bankruptcy Rule 9006 as written, the preference claim is timely, and the motion to dismiss Count V is denied.  The Trustee has established all of the elements of a preferential transfer under § 547, and the Defendants have failed to establish any of the statutory defenses.  The Trustee's motion for summary judgment in his favor on Count V is, therefore, granted.  There are questions of fact regarding the elements of the fraudulent conveyance claims under § 548 and State law, and the Trustee's motion for summary judgment on Counts III and IV is denied at this time.  On the record of this case, it is not possible to determine which State's law would apply to the claim for aiding and abetting a fraudulent conveyance, therefore, the motion to dismiss Count II is denied, without prejudice.

Rabinovici's motion to dismiss Count I against him alleging breach of fiduciary duty was premised on dismissal of the preference and fraudulent conveyance claims against other Defendants.  Since these claims are not all dismissed, Rabinovici's motion is also denied, without prejudice.

The Trustee is directed to settle an order and judgment on five days' notice.

Dated:  New York, New York
        March 26, 2014

                              s/Allan L. Gropper
                              UNITED STATES BANKRUPTCY JUDGE